## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW HAMPSHIRE

Arthur Doiron

       v.                                    Case No. 21-cv-360-SM

Jim Brown, et al.

### Report and Recommendation

Arthur Doiron, who is an inmate at the New Hampshire State Prison for Men ("NHSP") and is proceeding pro se, alleges in his initial complaint, pursuant to 42 U.S.C. § 1983, that employees of the New Hampshire Department of Corrections violated his federal rights and prison procedures in a disciplinary proceeding against him and in subsequent actions, which are alleged to have been retaliatory.  The court granted Doiron's motion to file a supplemental complaint and conducted preliminary review of Doiron's complaints, identifying fourteen claims with subparts, and granting Doiron leave to file an amended complaint to address specified claims.  Doc. no. 6.

After an extension of time, Doiron filed an amended complaint as allowed in the court's preliminary review order.  Doc. no. 8.  He then moved for leave to file a supplemental complaint, which was granted.  Doc. no. 10.  The complaint and the amendments were referred for preliminary review.  See LR 4.3(d); 28 U.S.C. §§ 1915A & 1915(e)(2).

Standard of Review

In an action brought by a prisoner against prison officers or officials, the court may dismiss claims if subject matter jurisdiction is lacking, a defendant is immune, the prisoner fails to state an actionable claim, or the action is frivolous or malicious.  § 1915(e)(2); § 1915A.  For purposes of deciding whether the complaint states an actionable claim, the court takes the factual allegations, without legal conclusions, as true and determines whether those facts are sufficient to state a plausible cause of action.  Hernandez-Cuevas v. Taylor, 723 F.3d 91, 102 (1st Cir. 2013); Machado v. Weare Police Dept., 494 F. App'x 102, 105 (1st Cir. 2012).  The court liberally construes a pro se complaint, using a less stringent standard than would apply to a pleading filed by a lawyer.  Erickson v. Pardus, 551 U.S. 89, 94 (2007).

Background

The background facts are taken from the court's previous order on preliminary review (doc. no. 6), as augmented by the amended complaint (doc. no. 8) and supplemental complaint (doc. no. 10).  Doiron's claims arise out of disciplinary proceedings brought against him and subsequent conditions, actions, and events that he alleges violated his federal rights and were in retaliation for filing this lawsuit.

2

A.    <u>Disciplinary Proceedings</u>

On or before January 29, 2021, NHSP Lt. Jim Brown charged Doiron with two disciplinary offenses, alleging that Doiron had telephone conversations with his mother about having repairs made to their truck, and that those conversations were actually coded communications related to drug transactions and bringing drugs into the prison.  Brown alleged that those conversations constituted evidence of a conspiracy which resulted in the introduction of illicit drugs into the NHSP.

On January 29, 2021, Doiron was removed from his medium custody housing unit and placed in the prison's Special Housing Unit ("SHU") on "Pending Administrative Review" ("PAR") status in connection with his disciplinary charges.  Doiron alleges that Brown did not send the PAR form with Doiron, as required by prison policy and procedures ("PPDs") which impaired his ability to appeal the status change.  He notes that Brown approved the disciplinary report although it bore the wrong date.  He also alleges that Brown and his staff failed to visit him every seven days, as was required under the PPDs.

Doiron remained on PAR status until his April 1, 2021, disciplinary hearing on those charges.  Doiron's disciplinary hearing was originally scheduled for February 22, 2021, but was continued to March 1, 2021, at Doiron's request.  On March 1,

2021, however, Doiron was moved to the NHSP Health Services Center ("HSC") where he was placed on suicide watch. Doiron remained in the HSC on suicide watch until March 31, 2021. Doiron's disciplinary hearing was continued until April 1, 2021, less than twenty-four hours after he was released from suicide watch.

Doiron contends that his ability to defend against the charges brought in the disciplinary proceeding was impaired by a lack of information. He alleges that a PPD precludes bringing two charges based on the same disciplinary infraction. Doiron further alleges that the Disciplinary Hearing Officer ("DHO") Barton did not allow him to present his arguments in his defense.

Following that hearing, DHO Barton found Doiron guilty of the charged disciplinary offenses. He imposed sanctions of 15 days punitive segregation, which was suspended; 125 days loss of visits; 125 hours extra duty; 125 days loss of recreation, canteen, and electronics; and 180 days loss of phone, suspended. Although Doiron understood that the sanction of 125 days loss of recreation, canteen, and electronics was suspended, it was imposed a week after the hearing.

Doiron alleges that he did not receive the hearing results immediately, which delayed his appeal, and that his appeal was made more difficult because the two charges had two case

numbers.  Doiron nevertheless appealed the results of the
disciplinary hearing to DHO Barton, asking him to reverse both
his guilty findings and the sanctions imposed.  When that was
unsuccessful, Doiron filed administrative appeals, first to NHSP
Warden Michelle Edmark and then to the office of DOC
Commissioner, Helen Hanks.  His appeals were denied.

After the disciplinary hearing, Lt. Brown initiated
proceedings to have Doiron's classification level upgraded to a
higher security status.  Doiron's classification upgrade hearing
was held on April 14, 2021.  At that hearing, his classification
status was upgraded from medium custody to C-4 security status.

Doiron alleges that throughout the disciplinary and
classification proceedings against him, Brown, Barton, Edmark,
and the DOC Commissioner's designee, Chris Kench, subjected him
to a number of due process violations.  Doiron also states that
the defendants' actions in this case violated the prison's own
policies.


B.  Educational Programs

Doiron alleges that at the time of his January 29, 2021,
transfer to SHU, he was enrolled in two "C-TEC" business classes
and a program called "Thinking for a Change."  He was also
scheduled to begin an anger management program and another
program at the NHSP's Family Connections Center in

February or March 2021.  Doiron asserts that when he was placed
on PAR status and moved to the SHU, he was automatically removed
from all of the classes in which he was enrolled, and from the
waitlist for the anger management and Family Connections Center
programs.  Doiron asserts that he would have earned a sixty-day
reduction of his minimum and maximum sentences had he been
allowed to complete the "Thinking for a Change" class, and an
additional sixty-day reduction of his minimum and maximum
sentences had he been allowed to take the Anger Management
class.

C. Conditions in SHU

When Doiron was transferred to the SHU on January 29, 2021,
he had a medical "bottom bunk pass," due to right knee and lower
back injuries.  Doiron was placed in a cell in the SHU with
a cellmate who also had a bottom bunk pass.  An officer at the
SHU told Doiron and his cellmate to "'[f]igure it out, fight for
it or one sleep on a mattress on the floor, we don't care.'"
Compl. (Doc. No. 1), at 16.  Because Doiron's cellmate was
already using the bottom bunk, Doiron had to sleep on a mattress
on the floor until February 24 or 25, 2021, when he was able to
move to a bottom bunk.

Doiron asserts that because his mattress was on the floor, insects crawled on him all day and night.  Further, he alleges that the dimensions of the cell required that his mattress be up against the cell toilet, causing his feet, sheets, and blanket to be splashed with his cellmate's urine whenever his cellmate urinated in the cell toilet.  Doiron also states that on several occasions, while he was sleeping on the floor, drains on his housing tier backed up, causing the entire tier to be flooded with feces, urine, and raw sewage.  On those occasions, Mr. Doiron asserts that his mattress sat in ½ inch of that material while he was sleeping on it, until he was allowed to clean his cell the following day.

Doiron further asserts that exposure to the waste and sewage which flooded his cell caused a burning sensation in his throat and lungs, and pain when taking a deep breath. Doiron reported these symptoms to NHSP nurses during sick call, who told him to drink plenty of water but otherwise refused to treat his symptoms.


D.  Conditions in the HSC

Doiron was housed in the HSC on suicide watch from March 1, 2021 to March 31, 2021.  During that time, he was barely able to sleep because bright lights were kept on twenty-four hours a day

and staff members would not let him keep his head under his
blanket.

### E.   Retaliation

Doiron alleges that since filing his initial complaint in
this action, he has been subject to retaliatory acts by NHSP
officers due to his having filed this lawsuit and grievances
against NHSP staff members.  Doiron states that the
retaliatory acts began on or about April 14, 2021, while he was
working on this lawsuit.

On April 18, 2021, Doiron sent a copy of his initial
complaint and motion for preliminary injunction in this case to
his mother so that she could make copies of those documents and
send them to this court.  Because mail to his mother is not
legal mail, Doiron had to deliver the complaint to prison
officials in an unsealed envelope for mailing.  Shortly after
sending that document, numerous officers, including Corrections
Officer Navarro, made comments to Doiron about his complaint,
motion, and administrative grievances he had filed against staff
members.  Doiron asserts that NHSP staff members also engaged in
a number of adverse acts against him, as set forth below.

1.   Request for Copy of Check

Doiron alleges that on April 14, 2021, while he was working
on this lawsuit, a check was inadvertently sent to him rather
than to his inmate account.  Doiron alerted staff that he had
the check and both the officer who delivered the check and a
supervising officer refused his request to make a copy of his
check as "proof" that the check had been sent to the prison.

2.   Denial of Meal

On April 23, 2021, Doiron alleges that when he and his
cellmate went to their cell to eat lunch, there was only one
tray of food. Doiron asked Correctional Officer Navarro for a
second tray.  Navarro responded: "'That's what happens when you
sue the prison or grieve the wrong officer.'"  Compl. Suppl.
(Doc. No. 4-1, at 2).  Doiron then told Correctional Officer
Partridge that only one lunch tray was delivered to his cell.
Partridge responded: "'Why do you think that is?'"  Id. at 3.

3.   Hunger Strike Transfer

On April 24, 2021, at sick call, Doiron spoke to Nurse
Karen and told her that Navarro had denied him lunch the
previous day, and that he had not eaten dinner because an
officer "disrespected [him] about [his] weight." Id. Nurse
Karen asked Navarro if he wanted to "'treat [Doiron] as a

hunger-strike.'"  Id.  Doiron objected, stating that he had
missed two meals, and that prison policy dictates that he has to
miss six meals to be considered to be on a hunger strike.
Thirty minutes after that interaction, Partridge went to
Doiron's cell and handcuffed him.  Partridge, accompanied by
Cpl. Camirand, escorted Mr. Doiron to the HSC as "a hunger
strike," id., despite the fact that he neither intended to
hunger strike nor engaged in behavior which met the prison
policy's criteria for a hunger strike.  After eating all of his
meals for two days, Doiron was released from the HSC on April
26, 2021.

### 4.   Harassment and Use of Force

While escorting Doiron to the HSC, Partridge led Doiron
through the SHU.  While walking through the SHU rotunda, Navarro
and other officers yelled at and surrounded Doiron.  At the same
time, Partridge forcibly pushed Doiron's forehead into the wall
without provocation.

### 5.  Strip Search

When Doiron arrived at the HSC with Partridge and Camirand,
he was placed in an isolation room where Partridge conducted a
strip search.  During the strip search, Mr. Doiron
asserts that:

> [Partridge] had Mr. Doiron bend over and spread his
> buttocks.  Mr. Doiron's fingers were on the inside of his
> anal cavity's crack; Defendant Partridge then forced the
> Plaintiff to place his fingers directly from his anal
> cavity to his mouth.  Mr. Doiron asked for gloves, hand
> sanitizer and to wash his hands first but Defendant
> Partridge smiled and chuckled as he refused all requests.

Doc. 4-1, at 4.  Doiron claims that there was no legitimate

reason not to allow him the ability to wash his hands or wear

gloves.

### 6.  Legal Mail and Legal Papers

On April 25, 2021, when Doiron's cell was empty, a SHU

officer went into the cell and removed a letter Doiron had

written to an attorney.  On July 18, 2021, Officer Carter went

into Doiron's cell while Doiron was in the mailroom and filled a

trash bag with Doiron's papers, which he alleges included legal

research, filings, and evidence related to this case.  Doiron

alleges that Carter said "good luck sueing [sic] the prison

now."  Doc. 8, at 2.

### 7.  Endangerment/Failure to Protect

NHSP Classification officials Glenn Mathews, Jay Mackey,

and Tara Whiting (collectively "Classification defendants") are

in charge of the "Keep Separate" lists in each NHSP inmate's

classification file in "CORIS," the prison's record-keeping

system.  Those lists identify, for each inmate, other inmates

who pose a security risk to her or him, and therefore must be
kept separate from her or him.

The Classification defendants are aware that Doiron has
longstanding issues with the Brotherhood of White Warriors
("BOWW") prison gang, and that he is not supposed to be housed
either with or around BOWW members.  The Classification
defendants previously decided to move Doiron from the Northern
New Hampshire Correctional Facility ("NNHCF") to the Merrimack
County Department of Corrections due to those security issues.
Doiron alleges that the Classification defendants also changed
his CORIS file to remove any mention of his security issues with
BOWW, although he never signed anything stating that those
issues no longer existed.

Doiron states that he had never had difficulties with other
inmates in the SHU until he sent his complaint in this case to
his mother.  Since then, Doiron claims that SHU staff are
putting "one BOWW member after another on the same tier with the
plaintiff."  Id. at 5.  On May 3, 2021, the day Doiron wrote his
complaint supplement, there were four BOWW members on his tier,
two of whom were in the cell next to his.  Doiron asserts that
BOWW members on his tier send him notes under his cell door
threatening him and his family.

In his second supplemental complaint, Doiron alleges that
Lt. Nadeau told him on August 31, 2021, that he was moving to

"FOCUS" in the general prison population at NNHCF.  Doiron

responded that he was in protective custody status and could not

live in general population.  Nadeau told Doiron that protective

custody status had been denied because Doiron did not meet the

criteria for that status.  The group that made the housing

decision was comprised of Nadeau, Capt. Berwick, and

Classification Supervisor Brenda Adam.  Nadeau moved Doiron to a

cell with a BOWW member, which Doiron alleges caused him

"physical and financial issues."  Doc. 10, at 6.


    F.  <u>Prior Order</u>

In the prior order, doc. no. 6 the court identified

fourteen claims with subparts.  Doc. 6, at 11-18.  Doiron filed

an amended complaint in response to that order in which he

withdrew Claims 1(c), (d), (n), and (s) and added an incident

about removal of his papers from his cell.  The identified

claims are as follows:

    1.  The defendants violated Doiron's Fourteenth Amendment
due process rights, his due process rights under state law,
and/or prison policy, in that:

        a.  Brown placed Doiron on PAR status and had him
transferred to the SHU without providing Doiron with a PAR form
until twenty-eight days after he was placed on PAR status, and
without any hearing or advance notice of either his placement on
PAR status or his transfer to the SHU;

        b.  The defendants failed to see Doiron every seven
days during the time he was on PAR status, in violation of
prison policy;

e.   On February 8, 2021, NHSP Maj. Jon Fouts approved Brown's disciplinary report against Doiron, despite the fact that the report was missing details of events, evidence, and copies of relevant documents;

f.   On February 15, 2021, Doiron was presented with a "Notice of Disciplinary Hearing" which identified what disciplinary offense he was charged with violating, but did not contain notice of the particular circumstances of the disciplinary charge;

g.   Brown indicated in Doiron's disciplinary report that evidence of the disciplinary offense, including phone records and a forty-page confidential report, had been secured, but did not include the location of that evidence in the report;

h.   Brown failed to list, in the disciplinary report, all of the relevant evidence implicating Doiron;

i.   Brown's disciplinary report was not sufficiently detailed to provide proper notice of the charges to Doiron, or to satisfy the prison policy concerning specificity of disciplinary reports;

j.   Brown "stacked" offenses against Doiron by including two charges against him in the disciplinary report, in violation of prison policy;

k.   Doiron's disciplinary hearing was scheduled for March 1, 2021, but was continued, without notice to Doiron, because Doiron was placed on suicide watch that day, although Doiron was prepared to go forward with his hearing;

l.   Doiron's disciplinary hearing was scheduled for April 1, 2021, less than twenty-four hours after his release from suicide watch, and without prior written notice to him of his new hearing date;

m.   Because the April 1, 2021 disciplinary hearing was conducted by telephone, Doiron was not able to see any of the evidence Hill submitted to the DHO that served as the basis for finding Doiron guilty of the disciplinary charges;

o.  At the April 1, 2021 disciplinary hearing, DHO Barton did not allow Doiron to challenge the "Details of Events" section of the disciplinary report, or the vagueness and lack of specificity in the report, on the basis that the testimony was irrelevant, and threatened to conclude the hearing if Doiron persisted in giving such testimony;

p.  At the April 1, 2021 disciplinary hearing, Barton did not allow Doiron to offer testimony and documentary evidence to demonstrate that the disciplinary report was issued against him in retaliation for numerous complaints and grievances Doiron had filed against Brown, finding that such testimony and evidence was irrelevant;

q.  At the April 1, 2021 disciplinary hearing, Sgt. Barton did not allow Mr. Doiron to call the State laboratory technician who prepared a report relevant to Doiron's disciplinary infraction, stating that the information Doiron sought was irrelevant, without providing further explanation;

r.  At the April 1, 2021 disciplinary hearing, Sgt. Barton did not allow Mr. Doiron to call Ryan Gallagher as a witness, on the basis that he did not have the written request Doiron had submitted to call Gallagher as a witness;

t.  Upon finding Doiron guilty of the charged disciplinary offenses, Barton imposed sanctions for those offenses, and told Doiron that some of those sanctions were suspended; but after the hearing was over, Barton imposed the "suspended" sanctions without prior notice to Doiron or further hearing;

u.  Barton failed to complete the "Hearing Result" section of the disciplinary report and to provide Doiron with a copy of those hearing results immediately after the April 1, 2021
hearing;

v.  When Barton sent Doiron a copy of his hearing results on April 15, 2021, the papers Doiron received were identified by two different case numbers: 21-02-0354 and 21-01-0354;

w.  Brown failed to appear at, or send a substitute to, or continue Doiron's scheduled April 5, 2021 classification upgrade hearing;

      x.  When Doiron's classification upgrade hearing was rescheduled from April 5, 2021, to April 14, 2021, Doiron did not receive prior notice of the rescheduled hearing;

      y.  At the April 14, 2021, classification upgrade hearing, Doiron was not allowed to defend against the classification upgrade or otherwise speak at the hearing, except to address whether his due process rights had been violated;

      z.  Warden Edmark and Maj. Fouts failed to respond to Doiron's grievances concerning his transfer, placement on PAR status, and disciplinary proceedings, or to his appeal of the disciplinary finding; and

      aa.  Kench denied Doiron's grievances concerning his transfer, placement on PAR status, and disciplinary proceedings, and his appeal of the disciplinary finding, without providing the reasons for those denials.

    2.  After Doiron was found guilty of the charged disciplinary offenses, Doiron's family members were barred from putting money into Doiron's inmate phone account with credit cards, including Doiron's own credit cards, in violation of prison policy;

    3.  Doiron's Eighth Amendment right not to be subject to cruel and unusual punishment was violated during his January 29, 2021 – March 1, 2021 placement in the SHU, in that:

      a.  SHU staff failed to provide Doiron with a bottom bunk, for which he had a medical pass;

      b.  Doiron was forced to sleep on a mattress on the floor, which subjected him to:

         i. insects crawling on him all day and all night;

         ii.  being sprayed with urine when his cellmate used the cell toilet; and

         iii. sleeping on a mattress which was sitting in raw sewage on several occasions when his housing tier flooded.

    4.  NHSP nurses violated Doiron's Eighth Amendment right to adequate medical care for a serious medical need, in that when raw sewage in his cell caused him to have a burning sensation in his throat and lungs, and caused him pain when taking a deep

breath, and the nurses to whom Doiron reported those symptoms told him to drink plenty of water, and otherwise refused to treat his symptoms.

5.   Doiron's Eighth Amendment right not to be subject to cruel and unusual punishment was violated during his March 1, 2021 – March 31, 2021 placement in the HSC in that bright lights were kept on twenty-four hours a day, causing him to have difficulty sleeping, and he was not permitted to keep his head under his blanket to block the light.

6.   Brown violated Doiron's state constitutional right to an education when he caused Doiron to be removed from two classes and at least two class waitlists on January 29, 2021.

7.    NHSP officers, including Navarro and Partridge, violated. Doiron's First Amendment right to free speech and interfered with Mr. Doiron's legal mail, by:

        a. Reading Doiron's outgoing mail to his mother which contained legal documents;

        b. Taking Doiron's letter to an attorney from his cell; and

        c.   Opening Doiron's incoming legal mail outside of his presence on a number of occasions.

8.   Partridge violated Doiron's Eighth Amendment right not to be subjected to cruel and unusual punishment in that he used excessive force against Doiron by pushing his face into a wall without provocation, and with the intent to cause Doiron pain and humiliation.

9.   Partridge violated Doiron's Eighth Amendment right not to be subjected to cruel and unusual punishment by subjecting him to unsanitary and inhumane conditions of confinement, in that, during a strip search, he required Mr. Doiron to place his hands in or near his anus, and then required Mr. Doiron to put his fingers in his mouth without allowing him to clean or sanitize his hands, or to use gloves.

10. Mathews, Mackey, and Whiting violated Doiron's Eighth Amendment right to be protected from a significant risk of serious harm from other inmates in that they failed to keep Doiron separated from members of a prison gang who pose a risk to his safety, which resulted in members of that gang being

housed in proximity to Doiron, and those gang members making threats to Doiron and his family.

11.    Mr. Mathews, Mr. Mackey, and Ms. Whiting violated Mr. Doiron's Fourteenth Amendment due process rights in that they changed information in his prison record in CORIS to remove mention of his security issues with BOWW, without first having Doiron sign a document stating that those security issues no longer existed.

12.    The defendants violated Doiron's First Amendment right to petition the government for a redress of grievances by taking the following actions against Doiron, in retaliation for his filing administrative grievances and this lawsuit:

a. On April 14, 2021, two NHSP officers refused to provide Doiron with a copy of a check he received in the mail, so that he could prove that the check had been mailed to the NHSP to be placed in his inmate account;

b. On April 23, 2021, Navarro and Partridge refused to provide Doiron with a lunch meal;

c. On April 24, 2021, Navarro and Partridge caused Doiron to be transferred to the HSC on the basis that he was on a hunger strike, when he was neither on a hunger strike nor engaged in behavior which met the criteria for identifying a hunger strike set forth in prison policy;

d. On April 24, 2021, while Partridge was escorting Doiron from the SHU to the HSC, he forcibly pressed Doiron's head into the wall in order to cause him pain, while a group of officers, including Navarro, surrounded and yelled at Doiron;

e. On April 24, 2021, during a strip search, Partridge forced Doiron to spread his buttocks by placing his fingers in or near his anus, and then to place his fingers in his mouth so that his mouth could be searched, without allowing Doiron to wash or sanitize his hands or to use gloves;

f. On April 25, 2021, a SHU officer removed a piece of legal mail from Doiron's cell while Doiron and his cellmate were out of the cell; and

g. Mathews, Mackey, and Whiting changed Doiron's prison records to remove any mention of security problems he had with BOWW, and failed to ensure that he was not housed with or near BOWW members.

h.  On July 18, 2021, Officer Carter removed Doiron's papers, including legal research, filings, and evidence related to this case from his cell to interfere with this case.

13.  Warden Edmark violated Doiron's First, Eighth, and Fourteenth Amendment rights, in that she was aware of all of the violations of Doiron's rights asserted in this action and failed to respond to any of his grievances or otherwise correct circumstances which violated Doiron's federal constitutional rights and prison policy.

14.  Commissioner Hanks violated Doiron's First, Eighth, and Fourteenth Amendment rights, in that she was aware of all of the violations of Doiron's rights asserted in this action and denied all of Doiron's appeals concerning those issues and failed to otherwise correct circumstances which violated Doiron's federal constitutional rights or the defendants' violations of prison policy.

## Discussion

Doiron's identified claims are subject to preliminary review, in conjunction with his amended complaint and supplemental complaint.

### A.  Identification of Defendants

In the prior order, the court directed Doiron to identify defendants in Claims 3, 4, 5, 7(a)-(c), 12(a), 12(d), and 12(f). He responded that he cannot identify the SHU staff in Claim 3 without information from the prison.  For Claim 4, Doiron names Nurse Olivia Gamelin and Nurse Karen LNU.  For Claim 5, Doiron

names Nurse Christine Bartlett.  For Claim 7, Doiron
acknowledges that he cannot identify what officer or officers
read his outgoing mail to his mother and to an attorney but
affirms his allegations that Navarro and Partridge interfered
with his mail.  For parts (a), (d), and (f) of Claim 12, Doiron
identifies Navarro as the officer who denied him a copy of his
check in 12(a); denies claims against the officers who yelled in
12(d); and states that he does not know who took his legal mail
in 12(f).

   B.   Due Process – Claims 1, 2, 11

   "The Fourteenth Amendment's Due Process Clause protects
persons against deprivations of life, liberty, or property; and
those who seek to invoke its procedural protection must
establish that one of these interests is at stake."  Wilkinson
v. Austin, 545 U.S. 209, 221 (2005).  In the context of prison,
to establish a protected liberty interest, an inmate must show
an "atypical and significant hardship on the inmate in relation
to the ordinary incidents of prison life."  Sandin v. Conner,
515 U.S. 472, 484-86 (1995).  The classification process, short-
term segregated confinement, and the loss of privileges do not
meet the Sandin standard.  Benner v. Alves, 2022 U.S. Dis. LEXIS
12980, at *7 (D. Mass. Jan. 25, 2022); Sanders v. Arseneault,
2021 U.S. Dis. LEXIS 50025, at *15 (D. Mass. Mar. 16, 2021);

Barnes v. Spaulding, 2020 U.S. Dist. LEXIS 189988, at *23 (D. Mass. Sept. 24, 2020); Wilson v. N.H. State Prison Warden, 2019 U.S. Dis. LEXIS 100750, at *5 (D.N.H. May 14, 2019).

Prison policies or procedures do not create constitutional rights, and violation of prison policies or procedures are not actionable under § 1983. Benner, 2022 U.S. Dist. LEXIS 12980, at *7; Collins v. FCI Berlin Warden, 2021 U.S. Dist. LEXIS 129155, at *6 (D.N.H. June 15, 2021); Wilson v. Edmark, 2020 U.S. Dist. LEXIS 206971, at *8-*9 (D.N.H. July 17, 2020); Querido v. Wall, 2010 U.S. Dist. LEXIS 139201, at *14, 2010 WL 5558915, at *3 (D.R.I. Dec. 8, 2010), R&R adopted, 2011 U.S. Dist. LEXIS 1882, 2011 WL 63503 (D.R.I. Jan. 7, 2011).  Further, the administrative policies and procedures adopted by departments of corrections generally do not provide prisoners with private causes of action.[1]  See Yerks v. McArdle, 2021 U.S. Dist. LEXIS 214345, at *7, n.1 (W.D. Wis. Nov. 5, 2021); Thomas-Weisner v. Gipson, 2021 U.S. Dist. LEXIS 157982, at *27 (S.D. Cal. Aug. 20, 2021).

---

[1] In contrast, outside of the prison context, an institution may be required to follow its own rules and regulations when taking certain actions.  See, e.g., Mabey v. Reagan, 537 F.2d 1036, 1042 (9th Cir. 1976) (administrative due process claim by college instructor after losing his job).

1.  <u>Claim 1</u>

In his amended complaint, Doiron supplemented Claim 1 with
allegations about actions taken or omitted by the defendants in
the course of the disciplinary process.  He does not allege
facts that show that the discipline he received as a result of
the charges against him imposed atypical or significant
hardship.  For that reason, Doiron does not state a viable claim
for violation of due process in Claim 1 and its subparts, and
that claim should be dismissed.

2.  <u>Claim 2</u>

In Claim 2, Doiron alleges that his family members were not
allowed to put money into his phone account, which violated
prison policy.  As stated above, a violation of prison policy,
standing alone, does not state a constitutional claim.  Claim 2
should be dismissed.

3.  <u>Claim 11</u>

Doiron alleges that the Classification defendants, Mathews,
Mackey, and Whiting, violated his due process rights by not
having him sign a change in the information on CORIS pertaining
to his security issues with BOWW.  Doiron, however, has not
alleged facts to show that he had a protected liberty interest
implicated by the defendants' alleged change in the information

in CORIS.  In the absence of a protected liberty interest,
Doiron cannot maintain a due process claim.  Therefore, Claim 11
should be dismissed.

        B.  Eighth Amendment – Conditions of Confinement –
Claims 3, 5, and 9

        "The Constitution does not mandate comfortable prisons, but
neither does it permit inhumane ones; accordingly, it is now
settled that the treatment a prisoner receives in prison and the
conditions under which he is confined are subject to scrutiny
under the Eighth Amendment."  Farmer v. Brennan, 511 U.S. 815,
832 (1994) (internal quotation marks omitted).  When challenging
the physical conditions of the prison, a prisoner must allege
sufficient facts to show that he was "incarcerated under
conditions posing a substantial risk of serious harm" and that
the defendant "acted, or failed to act, with 'deliberate
indifference to inmate health or safety.'"  Giroux v. Somerset
Cnty., 178 F.3d 28, 31 (1st Cir. 1999) (quoting Farmer, 511 U.S.
at 834).

        Doiron alleges for purposes of Claim 3 that SHU staff, who
are identified only as John Doe officers, failed to give him a
bottom bunk, as specified by his medical pass, which required
him to sleep on a mattress on the floor in unsanitary and filthy
conditions.  In Claim 5, Doiron alleges that Nurse Christine

Bartlett, in SHU, refused to let him put a blanket over his head
to block out the light for sleeping at night.  In Claim 9,
Doiron alleges that Corrections Officer Partridge subjected him
to unsanitary and inhumane conditions by requiring Doiron to put
his dirty fingers in his mouth during a strip search.

The allegations of Eighth Amendment violations in Claims 3,
5, and 9 are sufficient to pass initial screening.  Doiron will
be required to identify the officers in SHU who failed to give
him a bottom bunk before that claim can proceed to trial on
Claim 3.


### C.   Eighth Amendment – Medical Need – Claim 4

To state an Eighth Amendment claim arising from a lack of
medical care, a plaintiff must allege facts to show that the
defendants were deliberately indifferent to serious medical
needs.  Zingg v. Groblewski, 907 F.3d 630, 635 (1st Cir. 2018).
The claim consists of both objective and subjective elements.
Id.  The objective element requires proof that the medical need
has been diagnosed by a physician or is "so obvious that even a
lay person would easily recognize the necessity for a doctor's
attention."  Id.  The subjective element requires proof of
deliberate indifference, such as proof that the defendant had
actual knowledge of harm that was easily preventable."  Id.

In Claim 4, Doiron alleges that Nurse Olivia Gamelin and Nurse Karen LNU did not provide treatment to him when he had a burning sensation in his throat and lungs due to the smell of sewage in his cell.  Doiron's allegations do not show either a serious medical need or that the nurses were deliberately indifferent.  The conditions in the cell are better addressed as a conditions of confinement claim in Claim 3.  Claim 4 should be dismissed.

### D.   Eighth Amendment – Excessive Force – Claim 8

"In assessing a claim of excessive force, courts ask 'whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them.'" Lombardo v. City of St. Louis, 141 S. Ct. 2239, 2241 (2021) (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)).  The information and circumstances to be considered include "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." Id.  Doiron's allegations in Claim 8 that Partridge pushed his face into a wall without provocation

state a claim for excessive force that is sufficient for initial screening.

E.    Eighth Amendment – Failure to Protect – Claim 10

Under the Eighth Amendment, prison officials have a duty to protect prisoners from violence caused by other prisoners. Farmer, 511 U.S. at 832-33.  An Eighth Amendment violation occurs when a prison officer is deliberately indifferent to a substantial risk of harm to the prisoner.  Id. at 834.  In the First Circuit, a prisoner need not wait for an assault to occur to show a substantial risk of harm, if there is a strong likelihood of violence or when the risk of harm is pervasive. Lakin v. Barnhart, 758 F.3d 66, 71 (1st Cir. 2014); Purvis v. Ponte, 929 F.2d 822, 825 (1st Cir. 1991).

Doiron alleges that the Classification defendant, Mathews, Mackey, and Whiting, violated his right to be protected from other inmates by failing to keep him separated from members of the prison gang, BOWW.  As a result, he was housed near BOWW members, and he and his family received threats.  Doiron also alleges that he had a history of problems with members of the BOWW gang and that he has had protective custody status and keep away orders in the past for protection.  Doiron's allegations in Claim 10 are sufficient for purposes of initial screening.

F.  First Amendment – Claims 7 and 12

In Claims 7 and 12, Doiron alleges that prison officers violated his First Amendment rights by interfering with his mail and by retaliating against him for filing this lawsuit. Prisoners' mail is protected by the First Amendment in a variety of circumstances but to different degrees.  See Anctil v. Fitzpatrick, 2018 U.S. Dist. LEXIS 60398, at *4 (D. Me. Apr. 10, 2018).  To state a claim that officers interfered with legal mail in violation of the First Amendment, a prisoner must allege facts to show that officers opened protected mail and that their actions were not merely negligent but instead were regular and unjustifiable inference, wrongfully intentional, or resulted in punishment to the prisoner for the contents of the mail.  Stow v. Davis, 2022 DNH 025, 2022 U.S. Dist. LEXIS 42019, at *8-*9 (D.N.H. Mar. 9, 2022); Gibbs v. N.H. Dep't of Corrs. Comm'r, 2021 DNH 133, --- F. Supp. 3d ---, 2021 U.S. Dist. LEXIS 160571, at *14  (D.N.H. Aug. 25, 2021).

Doiron's allegations in Claim 7 show at most isolated incidents of reading or opening mail that are insufficient to state a violation of his First Amendment Rights.  Accordingly, Claim 7 should be dismissed.

The First Amendment also protects prisoners from retaliation by prison officers for bringing lawsuits against the

prison.  Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011).  To maintain that claim, a prison must allege facts to show that he engaged in a protected activity, filing a lawsuit, that the defendants took adverse action against him, and that a causal link exists between the lawsuit and the adverse action.  Id.; Smith v. Evangelidis, 2022 U.S. Dist. 50673, at *18-*19 (D. Mass. Mar. 22, 2022).  To rise to the level of a constitutional violation, the adverse action must be more than de minimis. Gibbs, 2021 U.S. Dis. LEXIS 160571, at *16-*17.

As identified initially, Doiron alleges seven adverse actions taken against him in retaliation for filing administrative grievances and this lawsuit, Claim 12(a)-(g). His allegations about a copy of a check do not show an adverse action above the de minimis level or a causal connection to filing this lawsuit.  Similarly, his allegations that a SHU officer took a piece of mail from his cell do not meet the requirements for a First Amendment retaliation claim. Accordingly, Claim 12 parts (a) and (f) should be dismissed. Claim 12 parts (b)-(e) and (g) are sufficient, on initial screening, and should proceed.


G.  State Constitutional Right to Education – Claim 6

To the extent a right to education has been recognized under the New Hampshire Constitution, that right has only been

recognized in the context of funding education of students in the state's public schools.  See Claremont Sch. Dist. v. Governor, 138 N.H. 183, 192-93 (1993).  No private right of action has been recognized in that context or otherwise.  This court is not an appropriate forum to raise a new and novel claim that would require a significant expansion of New Hampshire law. Doe v. Trs. Of Boston College, 942 F.3d 527, 535 (1st Cir. 2019); Ryan v. Royal Ins. Co. of Am., 916 F.2d 731, 744 (1st Cir. 1990).  Therefore, Claim 6 should be dismissed.

### H.  Supervisory Liability – Claims 13 and 14

Doiron alleges that the warden and the commissioner violated his First, Eighth, and Fourteenth Amendment due process rights because they knew of the alleged violations and did not respond to his grievances.  A supervisor's liability in a claim under § 1983 cannot be based on a respondeat superior theory or the supervisor's authority.  Guadalupe-Baez v. Pesquera, 819 F.3d 509, 515 (1st Cir. 2016).  "[T]he supervisor's liability must be premised on his own acts or omissions."  Id.  The plaintiff must show a causal relationship between the supervisor's acts or omissions and the violation of his rights. Id.

In this case, Doiron alleges that the warden and the commissioner were aware of the alleged violations of his rights

because he filed grievances of those matters and did not receive
responses from the warden or the commissioner.  Doiron's
allegations, however, do not show that the lack of response by
the warden and the commissioner caused the constitutional
violations that he raises here.  Cf. Guadalupe-Baez, 819 F.3d at
516.  Therefore, Doiron's claims against the warden and
commissioner in Claims 13 and 14 should be dismissed.


## Conclusion

For the foregoing reasons, the district court should
dismiss Claims 1, 2, 4, 6, 7, 11, 12(a), 12(f), 13, and 14.

The remaining claims are recommended to be renumbered as
follows:

1.    Doiron's Eighth Amendment right not to be subject to
cruel and unusual punishment was violated during his
January 29, 2021 – March 1, 2021, placement in the SHU, in
that:
        a.   SHU staff failed to provide Doiron with a
    bottom bunk, for which he had a medical pass;
        b.   SHU staff forced Doiron to sleep on a
    mattress on the floor, which subjected him to:
            i. insects crawling on him all day and all
    night;
            ii.  being sprayed with urine when his
    cellmate used the cell toilet; and
            iii. sleeping on a mattress which was
    sitting in raw sewage on several occasions when his
    housing tier flooded.

2.    Nurse Christin Bartlett violated Doiron's Eighth
Amendment right not to be subject to cruel and unusual
punishment during his March 1, 2021 – March 31, 2021,
placement in the HSC in that bright lights were kept on
twenty-four hours a day, causing him to have difficulty

sleeping, and Nurse Christine Bartlett did not allow him to keep his head under his blanket to block the light.

3.   NHSP Corrections Officer Partridge violated Doiron's Eighth Amendment right not to be subjected to cruel and unusual punishment in that he used excessive force against Doiron by pushing his face into a wall without provocation, and with the intent to cause Doiron pain and humiliation.

4.   NHSP Corrections Officer Partridge violated Doiron's Eighth Amendment right not to be subjected to cruel and unusual punishment by subjecting him to unsanitary and inhumane conditions of confinement, in that, during a strip search, he required Doiron to place his hands in or near his anus, and then required Doiron to put his fingers in his mouth without allowing him to clean or sanitize his hands, or to use gloves.

5. The Classification defendants, Glenn Matthews, Jay Mackey, and Tara Whiting, violated Doiron's Eighth Amendment right to be protected from a significant risk of serious harm from other inmates in that they failed to keep Doiron separated from members of a prison gang who pose a risk to his safety, which resulted in members of that gang being housed in proximity to Doiron, and those gang members making threats to Doiron and his family.

6.   The Classification defendants, Mathews, Mackey, and Whiting, violated Doiron's Fourteenth Amendment due process rights in that they changed information in his prison record in CORIS to remove mention of his security issues with BOWW, without first having Doiron sign a document stating that those security issues no longer existed.

7.   The defendants violated Doiron's First Amendment right to petition the government for a redress of grievances by taking the following actions against Doiron, in retaliation for his filing administrative grievances and this lawsuit:

> a. On April 23, 2021, NHSP Corrections Officers Navarro and Partridge refused to provide Doiron with a lunch meal;

> b. On April 24, 2021, Navarro and Partridge caused Doiron to be transferred to the HSC on the basis that he was on a hunger strike, when he was neither on a hunger strike nor engaged in behavior

which met the criteria for identifying a hunger strike
set forth in prison policy;

    c. On April 24, 2021, while Partridge was
escorting Doiron from the SHU to the HSC, he forcibly
pressed Doiron's head into the wall in order to cause
him pain, while a group of officers, including
Navarro, surrounded and yelled at Doiron;

    d. On April 24, 2021, during a strip search,
Partridge forced Doiron to spread his buttocks by
placing his fingers in or near his anus, and then to
place his fingers in his mouth so that his mouth could
be searched, without allowing Doiron to wash or
sanitize his hands or to use gloves;

    e. Mathews, Mackey, and Whiting changed Doiron's
prison records to remove any mention of security
problems he had with BOWW, and failed to ensure that
he was not housed with or near BOWW members.

    f. On July 18, 2021, Corrections Officer Carter
removed Doiron's papers, including legal research,
filings, and evidence related to this case from his
cell to interfere with this case.

The remaining claims will be served on Nurse Christine
Bartlett; NHSP Corrections Officers Partridge and Navarro; NHSP
Classification Officers Glenn Matthews, Jay Mackey, and Tara
Whiting; and Corrections Officer Carter pursuant to an order
issued on this same date.

Any objections to this Report and Recommendation must be
filed within fourteen days of receipt of this notice.  See Fed.
R. Civ. P. 72(b)(2).  The fourteen-day period may be extended
upon motion.  Only those issues raised in the objection to this
Report and Recommendation are subject to review in the district
court.  See Sch. Union No. 37 v. United Natl Ins. Co., 617 F.3d
554, 564 (1st Cir. 2010).  Any issues not preserved by such
objection(s) are precluded on appeal.  See id.  Failure to file

any objections within the specified time waives the right to appeal the district court's order.  See Santos-Santos v. Torres-Centeno, 842 F.3d 163, 168 (1st Cir. 2016).


                                Andrea K. Johnstone
                                United States Magistrate Judge

April 25, 2022

cc:  Arthur Doiron, pro se